[No. 14965. Department Two. February 13, 1919.]

*In the Matter of the Estate of* James M. Hagerty.[1]

Executors and Administrators (169)—Settlement of Account Effect—Conclusiveness. The settlement of the final account of executors fixing their compensation by an order that was a final judicial determination of the amount on hand under their joint control is not *per se* conclusive as to their joint liability for the future acts of one of them, resulting in loss of a portion of the property.

Same (47)—Joint or Several Liability—Acts of Coexecutor. An executor is not liable for the acts or defaults of his coexecutor unless he has aided, concurred in, or contributed thereto; and an executor will not be held negligent in allowing his coexecutor to so deposit funds in a bank that he could draw them out, where the testator had expressed confidence in the executors, who were to act without bond, and where he was led to believe that it required their joint check to withdraw the funds, and such had been their practice over a long term of years.

Same—Failure to Invest Funds—Interest. It is not an abuse of discretion to refuse to charge an executor with interest upon funds remaining in his hands from the time of the settlement of his account until the settlement of a supplemental final account pending an appeal, where it could not be foreseen how long it would be and the funds did not earn interest.

Appeal from a judgment of the superior court for Okanogan county, Neal, J., entered April 22, 1918, approving the final account of an executor, after a hearing upon objection before the court. Affirmed.

*George F. Hannan (Kronshage, McGovern & Hannan,* of counsel), for appellants.

*W. C. Gresham,* for respondent.

Parker, J.—This is an appeal by Helena, Jean, and Florence Hagerty, residuary legatees under the last will and testament of James M. Hagerty, deceased, from the decree of the superior court for Okanogan

[1]Reported in 178 Pac. 644.

county, settling the supplemental final account of Monroe Harmon, one of the executors named in the will. The main controversy here is over the refusal of the superior court to charge Harmon, as executor, with the sum of $2,470, being the amount of funds belonging to the estate appropriated by one of his coexecutors.

In April, 1905, James Hagerty made his last will and testament, naming appellants residuary legatees thereunder. L. L. Work, Monroe Harmon, and S. P. Ecki were named in the will as executors thereof, without bonds, and were by the terms of the will given large discretionary powers in the control, management, and settlement of the estate. By the terms of the will, it was contemplated that the duties of the executors would extend over a period of ten years or more before final settlement and distribution of the estate should take place. James M. Hagerty was at that time interested in mining and other properties in Okanogan county, which he was developing, and which he manifestly considered would be of much greater value in the future by management and development along the lines he was pursuing with reference thereto. He evidenced his wish in this respect in part as follows:

"I further desire the executors to pursue as near as possible the same policy towards the promotion and development of the properties I am interested in at the time of my death, which they know I have followed, and to use any moneys in their hands from whatever source it has arisen to protect the interest of the properties and of the other stockholders, the same as I have always done, and such properties as are not incorporated in a stock company, I would advise that it be done as soon as the properties are to be developed and wherever possible, that a majority of the capital stock be retained in the estate. I desire that my homestead shall not be placed on the market as a townsite

until such time as it is necessary in the development of the properties.''

He also expressed in the will his ''absolute confidence in these men named as executors, both as to their honor and ability to handle this trust.'' We notice these provisions of the will to the end that its spirit and the nature and extent of the confidence reposed by the testator in the named executors may be made plain.

James M. Hagerty died a few months following the making of this will, and thereafter, in September, 1905, the will was duly admitted to probate in the superior court for Okanogan county when the executors duly qualified as such and entered upon the discharge of their trust. The management of the estate fell largely into the hands of executors Work and Harmon, Ecki being a nonresident of this state. For present purposes we may regard Work and Harmon as having entire charge of the estate. In October, 1916, Work and Harmon filed a joint final account of their doings as executors, looking to the final settlement of the estate, showing that there was then on hand funds belonging to the estate amounting to $10,476, the possession of which, so far as appeared from the joint account, was the joint possession of the executors. Thereafter, upon due notice and hearing, that account was by the superior court approved by its order entered on December 13, 1916. Thereafter, in August, 1917, upon appeal to this court, that order was modified in so far as it determined the compensation of the executors (*In re Estate of Hagerty*, 97 Wash. 491, 166 Pac. 1139), when it was determined that the executors were entitled to no greater compensation than the amount of the funds of the estate already received by them as compensation. The larger part

of the $10,476, so reported and found by the court to be in the hands of the executors, was on deposit in the Commercial Bank of Okanogan, in the name of "Executors of Estate of James M. Hagerty, Deceased, L. L. Work." The deposit being so credited upon the books of the bank, it is conceded that Work was enabled to draw and pay out money therefrom by checks signed by himself alone, without having Harmon join in the signing of such checks. Work is an experienced banker and accountant. While Harmon is a man of business experience, he is not an accountant. So, by common consent, the keeping of the accounts and attending to the banking of the estate's funds was done by Work, while the attention of Harmon was directed to other things to be done in the management of the estate. Harmon was led by Work to believe that all funds of the estate deposited in the several banks with which they did business as executors from time to time were deposited in both of their names as executors, so that such funds could not be paid out except upon checks signed by both of them. From time to time during practically the whole of the eleven years covered by the management of the estate by Work and Harmon, prior to the settlement of their joint account, there had been paid out of the funds of the estate so deposited in the several banks, sums aggregating many thousands of dollars, upon more than a thousand checks, signed by both executors; and the evidence leads us to conclude, as it evidently did the trial court, that no money was ever drawn from these several deposits other than by checks so signed by both executors, until after the filing and settling of their joint account by the superior court on December 13, 1916.

Thereafter, on December 14, 1916, Work drew from the estate's deposit account with the Commercial Bank,

upon a check signed by himself alone, the sum of $2,470. This was done without the knowledge or consent of Harmon. All of the estate's money on deposit in the Commercial Bank was the proceeds of a sale of certain shares of stock belonging to the estate, the deposit being made early in the summer of 1916. Harmon did not receive the money so deposited, and never had it in his possession or control, though he believed it was under the joint control of himself and Work after being deposited in the Commercial Bank. This money was, in effect, collected by Work upon the consummation of the sale of the shares of stock. That is, he caused the Commercial Bank to receive a credit therefor in a Spokane bank, and the Commercial Bank in turn to credit the estate therefor as a deposit in the manner above noticed. From the time this deposit was so made in the Commercial Bank, up until the filing and settlement of their joint account in the superior court, many checks were drawn against it, signed by both Work and Harmon, as executors, such checks being so drawn and honored in due course in the conduct of the business of the estate, as had been done theretofore with respect to deposits of the estate's funds in other banks. It was the custom of Work to write the checks, sign them, and then present them to Harmon for his signature, Harmon at all times resting in the belief that all the deposits, including this one, were subject to be drawn upon only by checks signed by both of them.

Work drew from the funds of the estate on deposit in the Commercial Bank the $2,470, believing that he was entitled to that sum as his share of the compensation awarded by the superior court to the executors. Had the award of compensation so made by the superior court not been appealed from and modified by

this court, we may assume that Work would have been entitled to that amount of compensation in addition to the amount he had theretofore received. But by the modification of that order in this court it was finally determined that Work was not entitled to that or any other sum as compensation, in addition to what he had already received. We note that, while the order of the superior court approving their joint account and awarding them compensation was promptly appealed from by these same appellants, there was no attempt by appellants to in any manner supersede or stay the effect of that order.

During the afternoon or evening of December 14, 1916, the day on which Work drew the money from the estate's Commercial Bank deposit, Harmon learned of that fact and made inquiry of Work why he drew the money out, and by what authority he was able to have the bank honor his check without the signature of both executors thereon. Work then informed Harmon the manner in which the deposit had been made, enabling him to draw money thereon without the signature of both executors, and also informed Harmon that he did not want to have Harmon rendered responsible for his taking of the money. They then had some controversy as to the propriety of Work's act in taking the money, in view of the possible reversal of the superior court's order awarding them compensation, Harmon protesting that Work should have left the money in the bank until the amount of their compensation was finally disposed of upon appeal to this court, should such appeal be perfected. Their talk did not, however, result in Work returning the money at that time. When it became apparent to Harmon that Work was not going to return the money to the estate, a check was drawn against the deposit, signed

by both of them, in favor of Harmon for $1,000, to apply on his portion of the compensation awarded by the superior court, which amount, it is apparent, Harmon would have been entitled to had not the award of compensation made by the superior court been modified by this court. Thereafter, upon the modification of that award by this court, Harmon promptly returned the $1,000 received by him to the funds of the estate. Work has never returned to the funds of the estate any portion of the $2,470 so taken by him.

At the time Work drew this money, he was closing up his affairs in this state with a view of removing therefrom, and on the day following he went away, going to New Jersey, where he has since resided. Before going away, he gave Harmon written authority to draw all the money of the estate then on deposit in banks. In March, 1918, Harmon filed a supplemental final account and petition for distribution, reporting his doings as executor since the filing of the joint account by himself and Work, setting forth the facts relative to the taking of the $2,470 by Work, after the settlement of their joint account, praying that his account be approved, that he be not charged with the $2,470 taken by Work, and that the remaining property of the estate be distributed to those entitled to it under the will. Appellants filed their exceptions to this account, asking that Harmon be charged with the $2,470 taken by Work, insisting that he was jointly liable with Work therefor. These exceptions to Harmon's supplemental account were overruled by the superior court, upon the theory that, under the facts shown, Harmon was not liable for the money so taken by Work. This is the principal question presented upon this appeal.

It is first contended in behalf of appellants that the order of the superior court of December 13, 1916, ap-

proving the joint final account of Work and Harmon, became in effect *res judicata* as a final determination adjudging them to be jointly liable for all funds and property of the estate appearing by their joint final account to be on hand. This contention is rested upon our decisions in *In re Doane's Estate,* 64 Wash. 303, 116 Pac. 847; *Krohn v. Hirsch,* 81 Wash. 222, 142 Pac. 647, and *Davis v. Seavey,* 95 Wash. 57, 163 Pac. 35, Ann. Cas. 1918D 314, holding in substance, that orders, judgments, and decrees rendered in probate proceedings, settling final accounts, or making distribution of the estates of deceased persons, rendered upon due notice, have the same force and effect as other final judgments. It may be here conceded, for argument's sake, that the order settling the final joint account of Work and Harmon was a final judicial determination as to the amount of property and funds of the estate then on hand and under the joint control of both executors. But we think it does not follow from such view of the finality of the order of settlement that each executor would be, by virtue of that order of settlement, conclusively rendered liable for the future acts of the other, resulting in loss of some portion of the property or funds of the estate so determined to be then on hand and under the joint control of both executors. It was held by the court of errors and appeals of New Jersey, in a well considered opinion, that the fact that administrators or executors have filed a final account, and that a certain balance has been adjudged by the orphan's court to be due thereon, is not *per se* conclusive evidence as to their joint liability for the amount so settled. *Weyman v. Thompson,* 52 N. J. Eq. 263, 29 Atl. 685, 30 Atl. 249.

We are not, however, here concerned with the question of the joint liability, or the liability of one of the

executors for the act of the other, prior to or at the time of the settlement of their joint account; since the act of Work in taking the $2,470, resulting in loss to the estate, occurred after the filing and settlement of their joint account. We are of the opinion that that order is, in no event, such a final adjudication as to conclusively render Harmon liable for the act of Work in thereafter drawing from the deposit the $2,470, upon a check signed by himself alone as executor, the day following the entry of that order of settlement. Since Harmon was in good faith relying upon his justified belief that the funds of the estate were under the joint control of himself and Work at the time of rendering their joint account, he was thereafter in substantially the same position, as to his liability, as if Work had thereafter caused their joint control to be transferred to his separate control and then taken the money; the question thus becoming one as to the fault of Harmon in allowing Work to obtain such separate control as to enable him to take the money.

The courts of this country seem to be in irreconcilable conflict of opinion upon the question of when an executor becomes liable for the acts of his coexecutor, resulting in loss to the estate. In his concluding observations made in an exhaustive note appended to *Cheever v. Ellis*, 11 L. R. A. (N. S.) 297, the learned editor says, at page 349:

"It was stated in a case considered in this note that no other subject has produced so much judicial disagreement. So true is this statement that perhaps even now very little of the law involved can be said to be settled law."

It seems to us that the general rule of law here applicable is well stated by the learned editor of that note, near the introduction thereof (p. 298), as follows:

"It is a general, if not a universal, rule, that an executor or administrator is not liable for the acts, defaults, or devastavits of his coexecutors or coadministrators, unless he has in some manner aided, concurred in, or contributed to them."

The difficulty arises in the application of this general rule to facts attending particular cases to be determined, and this is wherein is found the seemingly irreconcilable conflict in the opinions of the courts. It seems to us that, while recognizing the general rule to be as stated in the last above quotation, each case is largely dependent upon its own peculiar facts and circumstances, taking into consideration the nature of the duties to be performed by those who are called upon to administer the estate, and the extent of the trust and confidence reposed by the testator in those to whom he has confided the administration of his estate.

Wherein did Harmon fail in the duty confided to him by the terms of the will? That he did no affirmative act resulting in Work taking the $2,470, is beyond question. So it becomes a question of whether or not he has failed to do something looking to the prevention of Work taking this money from the funds of the estate. Manifestly he has not so failed in his duty, unless it be held that he negligently allowed Work to obtain such control over the deposit in the Commercial Bank as to enable him to draw money therefrom by a check signed by himself alone.

It seems to us that these are the pertinent and controlling facts and considerations furnishing the correct answer to this question: (1) The deceased, by the terms of his will, vested large discretion in these executors in the management of the estate. (2) He exonerated them from giving bonds to secure the faithful performance of their duties. (3) He took

particular pains to express in his will "absolute confidence in these men named as executors, both as to their honor and ability to handle this trust." (4) Harmon was by Work led to believe that the deposit credit which Work had caused to be given the estate in the Commercial Bank was so given and entered upon the books of the bank that it could be paid out only upon checks signed by both of them. (5) This belief on the part of Harmon was the result of the manner in which other funds of the estate had been deposited and paid out, and the manner in which all money had been paid out of this deposit prior to the time of the settlement of their joint account. These facts, it seems to us, render it plain that the deceased did not expect or intend that these executors should deal with each other at arm's length, in the sense that their possession and control of the property and funds of the estate should be at all times an absolute joint possession and control in the sense that one should not repose any confidence or trust in the other; that, when Harmon entrusted to Work the making of deposits of the estate's funds in banks, he was not reposing any greater degree of trust and confidence in Work than the deceased himself did and intended should be reposed in one by the other in the management of the estate's affairs; that Harmon did all that a reasonably cautious business man would have done under the circumstances looking to a joint control of the estate's funds on deposit in banks; that Harmon was fully justified, by the course of conduct of Work, as he was led to view it, in assuming that the funds of the estate deposited in the Commercial, as well as other banks, were so made that the money could not be paid therefrom except upon checks signed by both of them; and that Harmon was not negligent in his duties as

executor in failing to discover the authority of Work, as between Work and the Commercial Bank, to check against the deposit therein without obtaining the signature upon such checks of Harmon. We deem it unnecessary to here review the numerous decisions of the courts dealing with the question of the liability of one executor for the acts of his coexecutor resulting in loss to the estate. Such a review would be but to confirm the view of the learned editor of the note in 11 L. R. A. (N. S.) 297, 349, above quoted from, to the effect that there is great conflict of judicial opinion in the application of the law to cases of this nature. We, however, note the following authorities, which we think lend support to the conclusion we here reach: *Peter v. Beverly*, 10 Pet. (U. S.) 532; *Irwin's Appeal*, 35 Pa. St. 294; *Lightcap's Appeal*, 95 Pa. St. 455; *Paulding v. Sharkey*, 88 N. Y. 432; *Bruen v. Gillet*, 115 N. Y. 10, 21 N. E. 676, 12 Am. St. 764, 4 L. R. A. 529; 11 R. C. L., pp. 409-411. We conclude that the trial court did not err in refusing to charge Harmon with the $2,470 taken from the funds of the estate by his coexecutor Work.

Some further contention is made in behalf of appellants that Harmon should be charged, as executor, with interest upon funds of the estate remaining in his hands from the time of the settlement of his and Work's joint final account until the settlement of his supplemental final account. We think it sufficient to say in answer to this contention that, while Harmon did have in his hands a considerable sum which was not yielding interest or income during that period, it is apparent that he could not foresee with any degree of certainty how long it would be before he would be compelled to pay out such funds upon distribution. During that time matters were pending which had to

be disposed of before final distribution, the final disposition of which was uncertain as to time. We think the superior court did not abuse its discretion in refusing to hold that Harmon should have invested the funds during that time so as to yield interest.

The decree appealed from is affirmed.

MOUNT, FULLERTON, MAIN, and HOLCOMB, JJ., concur.